UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   *Plaintiff*,<br><br>v.<br><br>$736,040.00 IN UNITED STATES CURRENCY,<br><br>   *Defendant*.<br><br>[CLAIMANT: DAVID SMITH] | No.<br><br><br><br><br><br><br><br><br>March 7, 2025 |

### VERIFIED COMPLAINT OF FORFEITURE

Now comes Plaintiff, United States of America, by and through its attorneys, Marc H. Silverman, Acting United States Attorney for the District of Connecticut, and David C. Nelson, Assistant United States Attorney, and respectfully states that:

1. This is a civil *in rem* action brought to enforce the provisions of 18 U.S.C. §§ 1343 and 1956.

2. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 & 1355. Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3. The Defendant is $736,040.00 in United States Currency. ("Defendant Currency").

4. The Defendant Currency is located within the jurisdiction of this Court.

### Background of Investigation

5. On January 5, 2023, at approximately 1:20pm, Officer Jeremy Williams, Officer Nicholas Kuhn, Sergeant Desiree Sheperis and Officer Aaron Miller from the Stamford Police Department ("SPD") responded to a location in Stamford, Connecticut for the report of a

1

physical domestic incident. The victim's boyfriend, David Smith, was found to be the primary aggressor in the domestic incident.

6. Smith was taken into custody and removed from the apartment. The victim was transported to the hospital.

7. While at the hospital, the victim informed law enforcement that there was a gun in the apartment, that Smith had pointed the gun at her stomach (she was pregnant), and that she wanted the gun removed from the apartment. The victim consented to a search of the entire apartment.

8. The victim signed a consent to search form. This is a standard form that allowed law enforcement to "seize any merchandise, material or other property that they deem involved in the investigation that they are conducting." The form authorized law enforcement to conduct a "complete search" of the premises.

9. The victim said that the last time she saw the black handgun was when Smith placed it in a black garbage bag and put it on the floor near the baby's crib, however she had left Smith alone in the apartment when she called 911.

10. Law enforcement returned the apartment to search for the firearm. One member of law enforcement remained at the hospital with the victim and informed the victim that she could withdraw consent at any time.

11. During the consensual search, law enforcement initially looked in the location where the victim said that the firearm was last seen, but they were unable to locate it. Law enforcement then used a K9 trained to detect gunpowder to attempt to locate the firearm, but the K9 was unable to locate the firearm.

12. While Officers were searching the apartment for the handgun, they observed several stacks of large amounts of money in various locations. While searching through a garbage can, officers found a large amount of credit cards with all different names, along with two California Driver's Licenses, also containing different names. Also found in plain view in the bedroom were five cell phones. The licenses were determined to be forged.

13. While continuing to search for the handgun, Officers located two gray Sentrysafe safes, one black Sentrysafe safe and one black Honeywell safe, all of which were locked, under the bathroom sink. The safes had stacks of large amounts of cash in front of them. A fifth safe, another gray Sentrysafe safe, was located in the kitchen. All safes were found to be heavy.

14. In continuing their search for the firearm, Officers searched on top of the stackable washer/dryer. There they found a black Springfield Armory XD 9mm handgun with an extended 16 round magazine, along with additional credit cards reading different names, and a key chain containing four Sentrysafe safe keys and one Honeywell safe key. The black Springfield Armory XD 9mm handgun with an extended 16 round magazine was eventually located on the top of a stackable washer/dryer unit.

15. All together, 109 payment cards were located and seized, only one of which was in the name David Smith. None of the cards were in the name of the domestic violence victim.

16. SPD officers transported this evidence to SPD Headquarters. During this transport, the Gray Sentrysafe safe which had been found in the kitchen popped open at the latch—this safe had not been locked. Inside this safe was a large amount of cash.

17. SPD obtained a search warrant for the four safes that did not accidentally open.

18. All of the remaining safes contained large amounts of cash. One of the safes contained documents relating to Smith, such as his social security card.

19. The cash seized by SPD is pictured below:



20. SPD obtained and executed another search warrant on Smith and the victim's apartment, with the focus of search warrant on finding additional evidence of financial crimes.

21. Law enforcement located nine additional payment cards, for a total of 118, with only one card being in Smith's name. These cards were found at the bottom of the same black garbage bin in the bedroom where the majority of the cards seized during the initial search had been found.

22. Located in the bedroom closet was an unopened piece of mail from Netspend, an alternative financial institution which specializes in prepaid cards. This piece of mail was addressed to a Brenda Gonzalez at a Mount Vernon, NY address. Inside the envelope law enforcement noted a thin rectangular item that felt consistent with a debit card. The address on the envelope in Mount Vernon, NY is the registered address for Smith's mother. A search in Accurint.com showed no records of a Brenda Gonzalez residing at this address.

23. Law enforcement also obtained and executed search warrants for all six cell phones seized from Smith (one at the time of arrest and five from the apartment) and for the financial records associated with the 118 debit cards. One of the phones, the one Smith had at the time of the arrest, could not be searched due to security features. Notably, 78 of the 118 debit cards were associated with Green Dot Bank.

24. Based on law enforcement's analysis of the financial records, the evidence found in the apartment, and the evidence located on the five cell phones, law enforcement believes that Smith obtained at least approximately $955,000 from the scheme detailed below.

25. Following Smith's arrest for the domestic charges he was interviewed at SPD Headquarters by Investigators Guilford and Longo. Smith was reminded he had just signed his notice of rights form moments ago. Smith was again handed a notice of rights form and read the first few words out loud indicating he could read. Smith then read his rights form and agreed to speak.

26. When Smith was asked how much money was in the safes he said he "couldn't give an estimate." Smith claimed he found the IDs and debit cards in an abandoned house but stated he never got to use them. Smith later claimed that he tried to withdraw the money on the cards but he did not have the PINs. Inv. Longo informed Smith that his story did not make sense. Smith further elaborated that he was trying to learn "things from scratch" and that "they gave me websites and I'm looking at the websites." Smith said he went on to these websites and that you could order things on the site, hold money, and transfer money from your account on the site. Smith said he went on the sites to "send money out" and that he was "trying and trying" to get money.

27. Based on Smith's statement it appeared that he was in contact with other unknown individuals who were coaching him on financial crimes and directing him to websites related to financial crimes.

28. Law enforcement is aware based on training and experience that numerous websites, forums, and "dark web" sites and marketplaces exist where users can buy and sell personal identifying information of ID theft victims, credit/debit card numbers, and information related to how to operate scams.

29. Based on all the available evidence to law enforcement, law enforcement believes that Smith used his multiple phones to place orders for DoorDash food delivery.

30. A DoorDash driver would accept that order and begin going heading to the restaurant to pick up the food. Smith would be notified on the DoorDash app who the driver was and be able to communicate with that driver. This is common so that DoorDash customers can leave special instructions for their drivers. Smith would then call these drivers by using an app to mimic the Door Dash support number. This technique is known as spoofing and would make it seem to the driver that they were legitimately being called by Door Dash support.

31. Smith would then impersonate DoorDash support and notify the driver via phone and text that the order they were about to pick up was placed with a stolen card and that DoorDash had frozen their DoorDash account because of this situation. Smith would then tell the driver they would need to be verified to resolve this issue.

32. Smith would then either trigger a verification code be sent to the driver or would text the victim a link to a phishing site he had created which mimicked the DoorDash website. It was Smith's goal to gain unauthorized access to the victim's DoorDash account using either of these methods.

33. When the victim clicked the link to his site they would sign in to what they believed to be DoorDash website. Instead, their log-in credentials would be sent directly to Smith. Smith would then use this information to log-in to their DoorDash account and change their banking information to one of the debit cards in his possession.

34. He would then trigger a cash out the DoorDash account to that card and steal the victim's delivery money that had been pooled in the account. He would explain to the victim that due to the delivery issue they would not be getting their paycheck on time and that it would be several days late. This delayed the victims from realizing their paychecks had been stolen and hindered their ability to recover their funds. Smith would then conduct withdrawals on the cards at various ATMs, converting the victims' funds into cash.

35. The Defendant Currency represents the proceeds of the above scheme, which involved fraud using wires, and the Defendant Currency is also involved in money laundering.

36. By way of example, Wells Fargo records show transactions on Smith's account activity that matches the Green Dot cards associated with the scam. Specifically, on September 13, 2022, one of the Green Dot cards shows a $163.00 debit at a Wells Fargo Bank in Yonkers. That same day Smith's Wells Fargo records show a $160.00 ATM cash deposit at a Wells Fargo branch in Yonkers, NY. The $3.00 difference would likely have been an ATM fee. As a second example, on November 14, 2022, one of the Green Dot cards is used to withdraw $300.00 at a Walgreens in Yonkers, NY. Smith's Wells Fargo account shows a $300.00 cash deposit on that same day at a Wells Fargo branch at 1076 Yonkers Ave in Yonkers, NY. Google Maps shows a Walgreens at 1046 Yonkers Ave.

37. Law enforcement contacted multiple victims of Smith's scheme. H.A. was one of the names listed on the Green Dot search warrant return as a "NameOnDeposit." H.A.'s name was

listed for several direct deposit payments put on a card in the name of Marcus Oducado. On February 6, 2023, law enforcement contacted H.A.

38. H.A. stated, in summary, that he/she was a DoorDash driver who was scammed. H.A. recalled around summertime 2022 he/she was delivering an order and received a call from a number that appeared to be from DoorDash support. The unknown person told him/her not to deliver the order as it had been paid for with a stolen payment card. H.A. was told his/her DoorDash account had been deactivated due to this order, and that he/she would be receiving a verification code to reactive his/her account.

39. H.A. remembered providing the individual the verification code he/she received, and being kept on the phone for over 30 minutes for the entire process, which also included him/her being told to text the code and his/her email address to a phone number, which he/she no longer had. After this conversation, H.A. was locked out of his/her account and his/her money was taken, which was difficult for him/her as this was his/her only means of employment at the time. H.A. believed approximately $4,000 total had been taken from him/her but was unsure of the exact amount due to the passage of time. According to the spreadsheet investigators received from GreenDot, H.A. had $86.34 and $764.15 taken from his/her account on August 16, 2022.

40. H.A.'s explanation of what happened him/her was consistent with what the other victims told law enforcement.

41. Based on law enforcement's review of the records and the overall evidence, law enforcement believes that Smith conducted this scam from approximately June 2020 until around the time of his arrest.

42. The State of Connecticut was prosecuting Smith for various crimes. Smith was killed in New York State on January 6, 2025.

## **CONCLUSION**

43. Based on the above information, it is believed that $736,040.00 in United States Currency constitutes the proceeds of wire fraud in violation of 18 U.S.C. § 1343 and was involved in money laundering in violation of 18 U.S.C. § 1956.

Wherefore, the United States of America prays that a Warrant of Arrest In Rem be issued for the Defendant Currency; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

The United States requests trial by jury.

MARC H. SILVERMAN,
ACTING UNITED STATES ATTORNEY

By:   /S/ David C. Nelson
David C. Nelson (ct25640)
Assistant U.S. Attorney
157 Church Street, 24th Floor
New Haven, Connecticut 06510
Tel:   (203) 821-3700
Fax:   (203) 773-5373
David.C.Nelson@usdoj.gov

## **DECLARATION**

I am a Task Force Officer with the Federal Bureau of Investigation, and the individual assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of March, 2025.


                                              /s/ Michael Stempien
                                            MICHAEL STEMPIEN
                                            TFO, FBI